## STARR FARM BEACH CAMPOWNERS ASSOCIATION, INC. v. John J. and Kathleen M. BOYLAN

[811 A.2d 155]

No. 01-297

August 19, 2002. Plaintiff Starr Farm Beach Campowners Association, Inc. instituted this action in Chittenden Superior Court, seeking to eject defendants John J. Boylan and Kathleen M. Boylan from property at Starr Farm Beach. Defendants appeal the trial court's grant of summary judgment for plaintiff, arguing that the trial court erred in finding no contract existed between defendants and plaintiff for a three year interim lease, and erred by refusing to provide defendants the benefit of the lease on equitable grounds. We affirm.

The Trust Estate of John J. Flynn, a perpetual charitable trust, owns the lots and all common areas at Starr Farm Beach, a seasonal community located in the far north end of Burlington. The Chittenden Trust Company (the "Trustee") acts as the sole trustee of this property. Over many years, the Trustee entered into land leases of varying lengths with individual owners of the thirty-four lots which make up Starr Farm Beach. Defendants have been leasing land from the Trustee at Starr Farm Beach since 1954. Most of these land leases, including defendants', expired on December 31, 1994, at which time one year at-will land leases were given to all camp owners. These one year leases continued in succession until the end of 1997.

On April 21, 1998, the Trustee sent a letter to all camp owners, including defendants. This letter was accompanied by a proposed three year lease, "covering a transitional three year lease period beginning January 1, 1998, through December 31, 2000," which had been filed in Chittenden Probate Court in connection with a proposed License to Lease. The letter stated, "[t]he Trust will offer you the lease of the lot . . . that has been previously leased to you as the site for your camp under the proposed lease." The letter further encouraged the campsite tenants to "consider making an offer to lease the entirety of the campsite property," and stated that first consideration would be given to proposals from a tenant group, or its representatives. The letter concluded by giving the Trustee's estimation of annual rent and annual property taxes payable for each of the next three years during the interim lease. The April 21, 1998 letter contained an estimate for the annual rent on defendants' property of $2,000.

On April 30, 1998, the Trustee sent another letter to all camp owners, including defendants. The letter informed camp owners that the license had been awarded by the probate court with respect to the new form of campsite lease, and instructed camp owners that occupancy would be allowed "this year before the leases are actually signed." The letter stipulated, however, that occupancy would be allowed only on the following limited terms and conditions:

> 1. Rent (that is, the "Basic Rent" referred to in Section 2.1) for the current year must be paid by May 15, 1998. This is either $4,000.00, $3,000.00, or $2,000.00 as indicated on your letter, dated April 21, 1998.

2. Occupancy will be on the terms and conditions described in the proposed lease . . . .

3. The lease must be signed and returned no later than June 15, 1998.

On May 11, 1998, defendants challenged the probate court's award of a license to lease with respect to the new three year interim lease form. Four days later, defendants submitted $2,000, the estimated annual rent according to the Trustee's April 21 letter, to the Trustee. Defendants also requested a copy of the lease so that they could sign and return it by the June 15 deadline set in the April 30 letter. Three days later, the Trustee returned the unendorsed check to defendants with a letter stating that since defendants had challenged the legality of the License to Lease for the new three year interim lease in probate court, the Trustee inferred that "the offer made . . . is unacceptable to you."

Three weeks later, on June 9, defendants again sent a $2,000 check and requested that a copy of the lease be sent to them in time for the June 15 signing deadline. Independent of this correspondence, on the same day, the Trustee sent a letter to all camp owners informing them of recent developments. First, Starr Farm Beach Campowners Association, LLC (the "Association"), a corporation comprised of the collective camp owners on Starr Farm Beach property, had been formed. Defendants chose not to join this group. Further, there had been a meeting between the Trustee and the Association which resulted in material changes to the three year lease form, and a new deadline of July 15, 1998, was mandated for signing and returning the new lease. The letter stated: "If you do not return the lease by July 15, the Trustee will assume that you have chosen to occupy this summer under the terms of the old, expired lease and you will receive a notice to vacate, effective December 31,

1999." On June 17, the updated lease was sent to all camp owners with the new July 15 deadline.

Noting that defendants' opportunity to appeal the probate court's decision to affirm its approval of a License to Lease had expired, the Trustee cashed defendants' rent check on July 16, 1998. Defendants had not returned a signed lease at this point. No communication took place between defendants and plaintiff until a Notice of Eviction was served on defendants, effective December 31, 1999.

At the time the Notice of Eviction was delivered by the Trustee, members of plaintiff Starr Farm Beach Campowners Association, Inc. were actively negotiating a ninety-eight year lease with the Trustee for the entirety of Starr Farm Beach property, including defendants' camp property. Having previously decided not to join plaintiff's group, defendants claim they wished to carry out the remainder of the three year lease, to which they argue they were a party, intending to use this time to find a purchaser for their camp.

Plaintiff initiated this action to enforce the eviction notice and eject defendants from their Starr Farm campsite. Defendants made various counterclaims, including that plaintiff had breached the three year lease defendants alleged existed between them, and that a basis existed for defendants' equitable recovery. Plaintiff moved for summary judgment, claiming there were no material facts in controversy and defendants' counterclaim was barred by the Statute of Frauds. In opposition to the motion, defendants argued that by its letter of April 21, the Trustee offered, in writing, a three year lease to defendants, scheduled to commence January 1, 1998, and end December 31, 2000. Defendants claim that they accepted the offer for a three year lease through tender of $2,000 as the requested first year's payment, thus making an enforceable contract for a three year interim lease.

An enforceable contract must demonstrate a meeting of the minds of the parties: an offer by one of them and an acceptance of such offer by the other. *Manley Bros., Inc. v. Bush*, 106 Vt. 57, 62, 169 A. 782, 783 (1934). To be valid, an offer must be one which is intended of itself to create a legally binding relationship on acceptance. *Broad St. Nat'l Bank of Trenton v. Collier*, 169 A. 552, 553 (N.J. 1933). As the trial court found, none of the letters from the Trustee were offers. They merely contained information about a proposed lease arrangement; it was the lease itself that had the power to bind the parties for three years. Further, the references to a three year lease in the two letters relate to future events. To illustrate, the April 21 letter speaks of a lease that *"will be* brought to market," and "the Trust *will offer* you the lease." (Emphasis added.) "An offer is a statement by the offeror of what he will give in return for some promise or act of the offeree." *Broad St. Nat'l Bank*, 169 A. at 553. The language used demonstrates that the letter itself was not intended to be an offer. "[A] mere expression of intention or general willingness to do something . . . does not amount to an offer." *Searles v. Trs. of St. Joseph's Coll.*, 695 A.2d 1206, 1212 (Me. 1997) (citation omitted).

Additionally, the Trustee's June 9 letter stated that if a lease was not returned by July 15, 1998, the Trustee would assume the tenant chose to occupy the premises during the 1998 summer under the previous lease terms, and the camp owner would be required to vacate by December 31, 1999. This letter was clear; absent an executed lease, occupancy of the premises would not continue past December 31, 1999.

Defendants' claim of acceptance of the proposed lease terms fails as well. Defendants complied with only one of the purported conditions of acceptance: payment of $2,000; they still failed to sign a lease.

[T]he offeror has a right to prescribe in his offer any conditions as to time, place, quantity, [or] mode of acceptance . . . and the acceptance, to conclude the agreement, must in every respect meet and correspond with the offer, *neither falling short of nor going beyond the terms proposed, but exactly meeting them at all points . . . and, in the absence of such an acceptance, subsequent words or acts of the parties cannot create a contract.*

*Kline v. Matcalfe Constr. Co.*, 27 N.W.2d 383, 386 (Neb. 1947) (citation omitted) (emphasis added). Defendants claim they could accept the terms of the lease simply by tendering a first year's rent check. However, nowhere in the communications by the Trustee to defendants is there an offer for a three year lease which may be accepted by payment of one year's rent. The only way to gain the protections of the three year lease was by both paying the rent pursuant to the lease, and by signing it.

Defendants never entered into a contract for a three year lease. Rather, their continued tenancy without a valid long-term lease is more appropriately viewed as a year to year tenancy. Cf. *Prescott v. Smits*, 146 Vt. 430, 432, 505 A.2d 1211, 1212-13 (1985) (Entry onto real property without a valid long-term lease creates a tenancy which is from year to year where there is a former agreement to pay annual rent.). The tender of $2,000 for one year's rent supports this interpretation of defendants' situation.

Defendants also claim that their June 9 request for a three year lease proves their continued interest in signing it. Just as a mere expression of willingness to contract does not amount to an offer, *Broad St. Nat'l Bank*, 169 A. at 553, neither does it amount to acceptance. See *New v. Germania Fire Ins. Co.*, 85 N.E.

703, 706 (Ind. 1908) ("In the case of a mere offer it is entirely clear that mental determination to accept, or even acts done in pursuance thereof, is not sufficient to bind the party who makes the offer."). Defendants needed to fully comply with the terms of the offer, *Kline*, 27 N.W.2d at 386, which were payment of the first year's rent and the return of a signed lease. They never signed and returned a lease.

By alleging that they requested a lease but never got one to "sign and send back," defendants concede that their interests were not protected with a three year lease. Defendants cannot seek to rely on a contract they knew did not exist. Since no lease was executed, this Court cannot create one for defendants' benefit.

In the event this Court finds no enforceable contract between defendants and plaintiff, defendants urge us to invoke equity to allow the benefits of the three year lease to flow to defendants. Defendants make a claim of equitable estoppel, and assert both the doctrine of unclean hands and the maxim that equity regards that as done which ought to be done.

We have previously outlined four elements necessary to support a claim of equitable estoppel. *Fisher v. Poole*, 142 Vt. 162, 168, 453 A.2d 408, 411-12 (1982).

> [F]irst, the party to be estopped must know the facts; second, the party being estopped must intend that his conduct shall be acted upon . . .; third, the [party asserting estoppel] must be ignorant of the true facts; and finally, the party asserting the estoppel must rely on the conduct of the party to be estopped to his detriment.

*Id.* at 168, 453 A.2d at 412. In response to plaintiff's summary judgment motion, defendants submitted an affidavit alleging that their reliance on the existence of a three year lease led them to believe they had more time to seek out a buyer of their interest. The trial court dismissed the estoppel claim because the only support the defendants offered was the affidavit, which claimed: "My wife and I have continuously occupied the premises as of right, have made certain payments with regard to the property, and *continue to rely* on the three year lease promise made to us by the Chittenden [Trust Co.] in 1998." (Emphasis added.) The court found this to be a "wholly conclusory" statement, as it supplied no factual basis for the court to evaluate their claim of detrimental reliance. We agree. Testimony which presents nothing but conclusions is insufficient to defeat a motion for summary judgment. Cf. *Morais v. Yee*, 162 Vt. 366, 371-72, 648 A.2d 405, 409 (1994) (expert opinions that are unsupported by any specific facts, or any indication of how the opinion was formulated, cannot be used to meet the burden of demonstrating a disputed matter of fact).

Defendants also argue that the doctrine of unclean hands applies to preclude plaintiff from obtaining the remedy sought. This doctrine is guided by the maxim that "he who comes into equity must come with clean hands." *Precision Instrument Mfg. Co. v. Automotive Maint. Machinery Co.*, 324 U.S. 806, 814 (1945). "Any willful act concerning the cause of action which rightfully can be said to transgress equitable standards of conduct is sufficient cause for the invocation of the maxim . . . ." *Id.* at 815. Defendants have not claimed that plaintiff has transgressed any equitable standards of conduct. Therefore, defendants' reliance on the unclean hands doctrine is unavailing.

It is true that "[e]quity regards that as done which ought to be done." *Dutton v. Davis*, 103 Vt. 450, 452, 156 A. 531, 531 (1931). However, defendants cite no authority, and we know of none, that would indicate equity should be invoked in these circumstances. " 'Equity' denotes

the spirit . . . of fairness, justness, and right dealing which would regulate the intercourse of men with men." *Hedrick v. Bathon,* 747 N.E.2d 917, 925 (Ill. App. Ct. 2001) (citation omitted). We see no evidence of any action taken by plaintiff which is outside the "spirit of fairness, justness, and right dealing" such that we need to effectuate a result different from that of the trial court in order to ensure an injustice does not occur here.

We find no offer and acceptance between plaintiff and defendants. As such, no contract exists between the two parties. Furthermore, defendants have made no persuasive argument for this Court to invoke equity.

*Affirmed.*